# UNITED STATES DISTRICT COURT

for the

Middle District of Tennessee

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* ) Case No. 3:23-mj-4189
a black Acer laptop computer, Model Number: N20C1, )
Serial Number: NHQEWAA0012091A40D3400 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the **Middle** District of **Tennessee**, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1958 | Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire |

The application is based on these facts:
See Attachment

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Stephen Hunter
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
(_____ic means).

Date: April 24, 2023

*Judge's signature*

City and state: Nashville, TN

Alistair E. Newbern, USMJ
*Printed name and title*

# STATEMENT IN SUPPORT OF SEARCH WARRANT

Stephen B. Hunter, Special Agent (SA), Federal Bureau of Investigation (FBI), Memphis Division, Nashville Resident Agency, being duly sworn, depose and state the following:

## INTRODUCTION

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device— which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachments B-1 and B-2.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 14 years. I have authored, executed, and/or participated in numerous search and seizure warrants for violent crime and illegal narcotics. I have conducted numerous controlled purchases of narcotics and firearms. I am experienced in handling CHSs during controlled purchases and utilizing audio/video devices during the transactions. I have participated in the operation and execution of Federal Title III orders. I have arrested and/or participated in the arrest of numerous persons for violations of State and Federal violent crime statutes, including for violations of Title 18. From November of 2009 until October of 2015, I was assigned to investigate violent gangs in the Washington D.C. and Prince George's County, Maryland, metropolitan area as a member of the FBI's Safe Streets Task Force. I am currently assigned to investigate violent crime and gangs in the Nashville, Tennessee, Metropolitan area as a member of the FBI's Violent Crime Task Force. I have received specialized training in the areas of violent crime and illegal narcotics. I have worked a variety of violent crime cases. I have also consulted at length with other law enforcement agents who have specific experience investigating murder-for-hire cases. I have training and experience in the investigation, apprehension and

prosecution of individuals involved in federal criminal offenses and other violent crime, the use of cellular devices to commit those offenses and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location. I have previously investigated multiple criminal violations and violent crime that have included the use of cellular telephones and laptop computers.

3. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

1. The property to be searched are a Black Samsung smart phone, IMSI: 310260263647612, ("**SUBJECT DEVICE 1**"), and a black Acer laptop computer, Model Number: N20C1, Serial Number: NHQEWAA0012091A40D3400, ("**SUBJECT DEVICE 2**"). The Devices are currently located at FBI Nashville Resident Agency.

2. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachments B-1 and B-2.

## PROBABLE CAUSE

1. Rent-a-Hitman: Your Point and Click Solution (https://rentahitman.com/) is a website originally created in 2005 to advertise a cyber security startup company. The company never took off, and over the next decade they received many inquiries about murder-for-hire services. The website's administrator then converted the website to a parody site that contains false testimonials from those who have purported to use hit man services, and an intake form where people can request services. The website also has an option for someone to apply to work as a hired killer. The website is maintained by an administrator in the state of California.

2. On February 16, 2023, **GARCIA** submitted an employment inquiry to www.rentahitman.com, through the inquiry function on the website, where he indicated that he was interested in obtaining employment as a hitman. In an interview of **GARCIA**, subsequent to his arrest, **GARCIA** stated that he used his personal laptop computer to search "Contract Mercenary Jobs" and located rentahitman.com. **GARCIA** also stated that he used his laptop computer to submit his initial inquiry with the website. In his inquiry, **GARCIA** indicated he had "military experience, and rifle expertise" and requested an "in depth job description". The name entered into the inquiry was Josiah **GARCIA** along with an email address containing his last name, and the following phone number: 615-609-6559. IP address and location information were captured during this communication, which was associated with a T-Mobile account, and placed the sender in the Nashville, Tennessee, area.

3. **GARCIA** stated that, after his initial inquiry, all further contact with the rentahitman website and the UC was made using his cell phone.

4. On April 17, 2023, T-Mobile provided subscriber information in response to a subpoena. Telephone number 615-609-6559 is subscribed to Patricia Garcia, 2711 Riverbend Drive, Nashville, TN 37214. Patricia Garcia is known to be **GARCIA**'s mother and the address 2711 Riverbend Drive matches the address on **GARCIA**'s driver license.

5. On February 17, 2023, **GARCIA** reached out again to the website via a service request. In this request, **GARCIA** included his home address, which matches the address on his Tennessee State driver license, as well as his correct date of birth. **GARCIA** indicated he was "looking for employment" but was having technical difficulties with the website. IP address and location information were captured during this communication, which was associated with a Comcast Cable account, and placed the sender in the Mount Juliet, Tennessee, area.

6. On February 18, 2023, the website owner, under the alias of "Guido Fanelli, CEO of Rent-a-Hitman" responded to **GARCIA** via email with a request for a resume, headshot, and an image of **GARCIA**'s identification.

7. On February 19, 2023, **GARCIA** replied via email with a resume, photo of his Tennessee State Driver license, and photograph of himself. **GARCIA**'s resume indicated he was employed in the Air National Guard from July 2021 until present. The resume also indicated **GARCIA** was a "Marksman Expert, awarded for not missing a single bullseye on all of the targets and for shooting expert with 2 (or more) weapons". The resume indicated **GARCIA** was nicknamed "Reaper," which was "Earned from Military experience and Marksmanship."

8. On February 20, 2023, **GARCIA** sent another follow-up email to the website owner and advised that he was following up because he had not heard back after submitting his resume. **GARCIA** added: "*Why I want this Job*" : Im looking for a job, that pays well, related to my military experience (Shooting and Killing the marked target) so I can support my kid on the way. What can I say, I enjoy doing what I do, so if I can find a job that is similar to it, (such as this one) put me in coach!" I believe that **GARCIA** was stating his skillset matched the needs of a company that hires employees to commit murder.

9. A Facebook account believed to belong to **GARCIA** has a public profile with the name "Josiah Garcia" and photographs that match the headshot and identification card that were sent in the email described above. On February 20, 2023, **GARCIA** posted a photo of an AR-15 rifle on the Facebook profile with the caption "She's beautiful."

10. On February 23, 2023, **GARCIA** sent another follow up email stating that he had not heard anything back in a while and wanted to follow-up in hopes of scheduling an interview soon.

11. On March 13, 2023, **GARCIA** sent another follow up email stating that he had not heard back about potential employment opportunities and wanted to check in. **GARCIA** stated that he hoped to hear back soon.

12. On March 16, 2023, at the direction of the FBI, the website owner responded to **GARCIA** with an email stating; "Josiah, a Field Coordinator will be in touch in the near future. You will receive a message when they are ready. Timing is based on client needs."

13. On April 3, 2023, an FBI Undercover Employee (UCE) contacted **GARCIA** via text message to arrange a telephone call. The UCE sent text messages to 615-609-6559, which is the phone number that **GARCIA** provided in his inquiries described above. All future text messages between **GARCIA** and the UCE took place on **GARCIA**'s cell phone; 615-609-6559. The UCE advised they were a recruiter for Rent A Hitman, asked **GARCIA** if he was still interested in a job and if he wanted to schedule a phone interview. The UCE also advised the phone interview was a preliminary interview and an in-person interview would be scheduled if the phone interview was successful. **GARCIA** advised he wanted to do the phone interview. The UCE and **GARCIA** agreed to talk via telephone on April 5, 2023, at 12:00p.m.

14. On April 5, 2023, the UCE placed a monitored and audio-recorded phone call to **GARCIA** at 615-609-6559. During the call the UCE asked **GARCIA** if he was law enforcement of any kind. **GARCIA** stated that he was not, but that he was in the Air National Guard. **GARCIA** stated that he was a trained military sniper and hoped him being in the military would not disqualify him for the job. The UCE told **GARCIA** that talking to the company is not a crime or illegal, but commission of the hired job is a crime. **GARCIA** responded, "Yes sir." **GARCIA** stated that he had two questions, which were, "How soon can I start?" and "What do the payments look like?" **GARCIA** stated that he had more rifle training than training in close quarters combat. When asked

if he preferred to shoot people from distance, **GARCIA** replied "Yes sir." The UCE told **GARCIA** that payment was based on **GARCIA**'s skill set and who the "mark" was, and that payment is made half up front and half when the mission is completed. The UCE told **GARCIA** that payment is also based on the number of people you kill. **GARCIA** asked if "fifteen to twenty thousand would be too much to ask?" When asked if **GARCIA** was comfortable with taking fingers or ears as trophies or performing torture at a client's request, his response was "if it's possible and in my means to do so, I'm more than capable." **GARCIA** stated that he would take a job to kill for as little as twenty-five hundred dollars. The UCE stated that jobs at that price were easier jobs to complete. When asked what guns he owns, **GARCIA** stated that he owns an M4A1 (AR-15) but no other guns. Later in the conversation, **GARCIA** again confirmed that he was comfortable with torture of victims and taking trophies at a client's request. **GARCIA** stated, "I definitely want to meet. I'm ready for this." The UCE asked, "What made you interested in this profession?" **GARCIA** responded, "Being in the military, doing that sort of work already. I was looking into civilian law enforcement but that's not for me. I wanted something more exciting. I started searching the web and then I found this, so here I am." The call ended with the UCE asking, "How quickly are you looking to start working?" **GARCIA** responded "As soon as possible."

15.     On April 6, 2023, the UCE and **GARCIA** exchanged text messages to confirm the time and location for them to meet. **GARCIA** met the UCE at a restaurant/bar located in Nashville, Tennessee. The UCE told **GARCIA** that did not have to do this and can walk away at any time. The UCE asked **GARCIA** if he was sure he wanted to do this (accept a murder-for-hire job). **GARCIA** responded, "I've been looking into this for some time now. I was looking for a way to make good money." **GARCIA** was asked again if he was sure he wanted to do this type of work and told he was under no obligation to do so. **GARCIA** responded again that he had been looking

into it [killing people for money] for a long time. **GARCIA** stated that he was concerned that the UCE may be law enforcement but is now comfortable the UCE is not. He stated that he was looking for contract mercenary jobs online and that took him to contract hitman jobs. **GARCIA** asked if, after the job is finished, if it would get traced back to him. The UCE told **GARCIA** that if he was sloppy when he killed someone and was caught, the company could not help him. **GARCIA** stated that he was not very worried about that because of the training he received in the Air Force. He stated that the training he received in the Air Force was applicable to this job due to a lot of firearms training and receiving some of the Air Force "Special Forces" training. **GARCIA** stated that he owned a black BMW that was registered to him.

16. Agents queried public and law enforcement databases and confirmed that a 2020 Black BMW X3, Tennessee Tag 309BLBM, Registered to Josiah Garcia, at an address known to be associated with **GARCIA**'s parents, where **GARCIA** has told the UCE that he currently resides.

17. **GARCIA** confirmed that the only gun he owns is an M4A1 rifle and he did not think the bullets would be traceable to him. **GARCIA** stated that he is in the process of trying to buy a handgun and showed the UCE a picture of a Sig Sauer handgun on his phone. **GARCIA** stated that he works one weekend per month in the Air National Guard and is otherwise unemployed. **GARCIA** inquired about the flexibility of the job due to him attending college next year. At this point, the UCE asked **GARCIA,** "You are locked in? This is what you want? Because it sounds like you have a lot going on. You're in the military. You've got college. You've got a lot going on, as far as good things in your life to kinda' get in this world. It is a shady world and I just don't want you to have regrets if you come to work for us, because it, I mean it messes with your mind, shooting people." **GARCIA** stated that he had weighed the psychological effects of killing someone and he was ok with it. **GARCIA** stated that he would prefer to work in another state but

is ok to kill some local people. The UCE told **GARCIA** that if he were to kill fifty people he would make a large amount of money. **GARCIA** responded, "That's rookie numbers for the Reaper." Towards the end of the meeting **GARCIA** stated, "My only question is when can I start?" and then stated, "I'm very excited."

18. On April 9, 2023, the UCE sent a text message to **GARCIA**. The UCE told **GARCIA** that a job was available, if **GARCIA** was interested, and asked to meet with **GARCIA** on Wednesday, April 12, 2023. The UCE stated it was an "easy mark." **GARCIA** responded "Sounds good. Is there a specific time/date it needs to be done." The UCE told **GARCIA** that they would talk in person about the details. **GARCIA** agreed to meet with the UCE on April 12, 2023, at a location to be determined.

19. On April 11, 2023, the UCE sent a text message to **GARCIA** to confirm the meeting on April 12, 2023. The UCE and **GARCIA** discussed timing but did not settle on a specific time. The UCE told **GARCIA** that he would text him an address on the afternoon of April 12, 2023.

20. On April 12, 2023, the UCE and **GARCIA** again exchanged text messages, wherein, the UCE and **GARCIA** set a time to meet, and the UCE provided **GARCIA** with the meeting location, which was a public park, located in Hendersonville, Tennessee.

21. On the afternoon of April 12, 2023, **GARCIA** sent a text message to the UCE telling the UCE that he was getting off of the exit and arriving at the parking lot of the meeting location. **GARCIA** arrived at the meeting location in the above-described BMW.

22. The meeting was audio recorded and transmitted live to other FBI Agents who participated in the operation. During the meeting **GARCIA** was presented with a target package consisting of photos and description of a fictional target's name, weight, age, height, weight,

address, and employment information. The UCE explained the target was the husband of the client and he was abusive to her. The client was paying $5000 for the target to be killed. The UCE told **GARCIA** that the client was going out of town for a week to ten days and the husband would be home. The payment would be $2500 now, and the rest when the job was complete. **GARCIA** was provided with an envelope containing $2500 cash. The UCE told **GARCIA** to count it to make sure it was good. **GARCIA** counted the money. The UCE told **GARCIA** that he would meet up with him again in approximately one week to provide him the rest of the money. During the conversation, **GARCIA** asked the UCE if he needed to take a photo [of the dead body] as proof that the job was complete. **GARCIA** was subsequently arrested by the FBI.

23. Following his arrest, and after waiving his Miranda rights, **GARCIA** was interviewed by agents of the FBI and provided the following information. **GARCIA** was looking for work because he needed money and his family could not afford rent. A coworker at the Air National Guard suggested GARCIA look for "contract mercenary jobs" GARCIA searched that term online and came across the rentahitman.com website. On Friday, April 7, 2023, **GARCIA** learned he had been hired by Vanderbilt medical and he was scheduled to start training for the job on Monday April 10, 2023. When he was hired by Vanderbilt he had second thoughts about the hitman job and changed his mind. **GARCIA** stated that he was meeting the UCE to tell him he had changed his mind and did not want to do this kind of work. **GARCIA** was going to call the UCE when he got to his car and leave the money on the curb for the UCE to pick up.

24. On April 13, 2023, **GARCIA** was charged by Federal Criminal Complaint, of a violation of 18 U.S.C. § 1958 (See 3:23-mj-02033).

25. The Devices are currently in the lawful possession of the Federal Bureau of Investigation (FBI). It came into the FBI's possession in the following way: **SUBJECT DEVICE**

**1** was in **GARCIA**'s possession and located in his pants pocket when he was arrested on April 12, 2023. **SUBJECT DEVICE 2** was located in **GARCIA**'s bedroom when his bedroom at his residence was searched the evening of April 12, 2023. **GARCIA** provided law enforcement with passwords for both devices.

26. The Devices are currently in storage at the FBI Nashville Resident Agency. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the FBI.

## TECHNICAL TERMS

1. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

c. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence

of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

2. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

3. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

4. *Forensic evidence.* As further described in Attachments B-1 and B-2, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

5. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

6. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court

to authorize execution of the warrant at any time in the day or night. In addition, based on my training and experience with locked devices, this application seeks permission to allow a third party to unlock the device to allow forensic examination.

## **CONCLUSION**

7. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachments A-1 and A-2 to seek the items described in Attachments B-1 and B-2, respectively.

## ATTACHMENT A-2

The property to be searched is a black Acer laptop computer, Model Number: N20C1, Serial Number: NHQEWAA0012091A40D3400 (**SUBJECT DEVICE 2**). The Device is currently located at FBI Nashville Resident Agency.

This warrant authorizes the forensic examination of the device for the purpose of identifying the electronically stored information described in Attachment B-2.

# ATTACHMENT B-2

1. All records on the Device described in Attachment A-2 that relates to violations of Title 18, United States Code, Section 1958 and involve Josiah Ernesto Garcia, including:

   a. Messages, phone calls, e-mails, or any contact between **GARCIA** and the rentahitman.com website, the UCE or others regarding a desire to be a hitman;

   b. Any information showing search results where contract mercenary jobs, security jobs, hitman jobs or anything else related to hitmen or firearms were searched;

   c. Any information regarding posts or messages made through Facebook or other social media during the relevant time period;

   d. Any information recording **GARCIA**'s schedule or travel from February through April of 2023;

   e. All bank records, checks, credit card bills, account information, and other financial records;

   f. Any and all records associated with ownership, and payment for the BMW motor vehicle described herein;

   g. Any photographs, images, or videos pertaining to firearms or otherwise related to obtaining work as a hired killer.

2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including

any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.